IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THOMAS GARNER and CAMMI GARNER,<br><br>                    Plaintiffs,<br><br><br>v.<br><br><br>THE CINCINNATI INSURANCE COMPANY,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No. 2:24-cv-00378-TC-DAO<br><br>Judge Tena Campbell<br>Magistrate Judge Daphne A. Oberg |

Before the court is the Motion for Summary Judgment filed by Defendant The Cincinnati Insurance Company (Cincinnati Insurance). (ECF No. 45.) For the reasons stated below, the court denies the motion.

## BACKGROUND

This insurance dispute arises from a car accident that injured Plaintiff Thomas Garner, a traveling hospice nurse for Advanced Health Care Corporation (AHCC). (Dep. Thomas J. Garner, Nov. 28, 2022 (1st Garner Dep.), ECF No. 51-11 at 6:14–19.) The accident occurred at 9:30 a.m. on November 18, 2021, when Michael Haws rear-ended Mr. Garner. (Am. Compl., ECF No. 17 at ¶ 10; Police Report, ECF No. 45-1 at 3.)

The night before the accident, Mr. Garner completed a shift at 5:00 p.m. and was on call until 9:00 a.m. on the morning of the accident. (1st Garner Dep. 9:12–15.) While on call, Mr. Garner was responsible for clients and received additional compensation. (Id. at 7:22–8:4, 13:17–22.) Mr. Garner would field calls and visit patients during on-call time periods. (Id. at

1

26:3–23.)  Mr. Garner was also expected to prepare his vehicle and equipment while on call to allow him to respond to patient calls quickly.  (Dep. Cammi Garner, ECF No. 51-12 at 24:23–26:10.)  And before leaving in the morning, he would log in to his company iPad and complete patient charting.  (1st Garner Dep. 18:14–20.)

Around 8:00 a.m. on the morning of the accident, Mr. Garner made an entry using company software.  (Ex. M to Pls.' Opp'n, ECF No. 51-13 at 5.)  Mr. Garner's son recalls seeing his father in his scrubs typing on a work device before leaving home on the morning of the accident.  (Decl. Grantley Garner, ECF No. 51-14 at ¶¶ 4–6.)  Mr. Garner has little memory of the day of the accident and cannot recall what his intended destination was before the accident occurred.  (1st Garner Dep. 12:6–13:1.)  Mr. Garner testified that he knows he was visiting a patient because was wearing scrubs and had his medical equipment in his car.  (Id. at 12:6–17.)  Typically, Mr. Garner left his home between 8:30 and 9:00 a.m. to start visiting patients.  (Id. at 22:8–16.)  AHCC requires traveling nurses to travel by car, and Mr. Garner drove his personal vehicle.  (Dep. Andrea Huff, ECF No. 51-16 at 29:23–30:2; Am. Compl. ¶ 6.)

AHCC paid Mr. Garner about 50 to 52 cents a mile for work-related travel, excluding travel from his home to his first patient visit of the day.  (1st Garner Dep. 24:6–9; 2nd Garner Dep. 24:13–25:7.)  But Mr. Garner was otherwise not reimbursed for gas, services, or auto insurance, and he was not given instructions on his driving routes.  (Dep. Thomas J. Garner, Apr. 15, 2025 (2nd Garner Dep.), ECF No. 45-2 at 23:15–24:1, 24:6–8, 32:2–25.)  AHCC required traveling nurses to answer calls while driving to patients, including during the drive to the first visit of the day.  (C. Garner Dep. 27:22–28:10; Dep. Gabrielle Garner, ECF No. 51-17 at 21:7–24; Dep. Rhonda Brooks, ECF No. 51-19 at 30:2–7.)  And if the assigned traveling nurse could

complete a visit, AHCC sent a replacement nurse.  (Dep. Susan Davies, ECF No. 51-18 at 16:5–15.)

Mr. Garner suffered serious injuries as a result of the accident.  (Am. Compl. ¶¶ 10–11.) While the full cost of Mr. Garner's injuries remains unknown, the amount exceeds $1.3 million. (Id. ¶ 12.)  Mr. Haws admitted that he was at fault for the accident, and Mr. Haws's liability insurance carrier has paid the Garners $1 million.  (See Ex. B to Pls.' Opp'n, ECF No. 51-2; Pls.' Suppl. Authority, ECF No. 67.)  Because Mr. Haws's insurance policy covers only $1 million in damages, Mr. Garner filed a reimbursement claim with AHCC's insurance company, Cincinnati Insurance, to cover, at the least, the difference of approximately $300,000, citing the coverage provision in AHCC's underinsured motorist (UIM) policy (the Policy).  (Policy, ECF No. 45-4 at 20.)

After consulting with outside coverage counsel at Litchfield Cavo, LLP (Litchfield Cavo), Cincinnati Insurance denied Mr. Garner's claim on February 25, 2022.  (See Coverage Determination, ECF No. 51-20.)  The Garners' pre-suit counsel sent Cincinnati Insurance an email pointing out the provision of the UIM endorsement covering employees of the named insured in the course and scope of their employment.  (See Email from Brian Coutts to Robert Poppleton, Feb. 11, 2022, ECF 51-8 at 33–34.)  But Cincinnati Insurance did not forward this email to Litchfield Cavo.  (Dep. Mason Chandler Hill, ECF No. 51-6 at 80:9–81:1.)

Litchfield Cavo wrote a memo advising Cincinnati Insurance that while it had determined that Mr. Garner was in the course and scope of his employment during the accident, it interpreted the Policy to mean that Mr. Garner was not covered because he had been driving his personal vehicle in the accident.  (Litchfield Cavo Memo, ECF No. 45-8.)  The opinion from Litchfield Cavo did not address the provision of the UIM endorsement that the Garners' pre-suit

counsel pointed out in his email.  (Hill Dep. 91:10–22.)  In this case, the Garners challenge Cincinnati Insurance's denial of coverage under the Policy held by Mr. Garner's employer (ECF No. 45-4), bringing claims for breach of contract, breach of the duty of good faith and fair dealing, and declaratory judgment.  (Am. Compl. ¶¶ 30–45.)  Mr. Garner claims the present value of his economic losses, including future medical treatment and lost income, amounts to $10 million.  (ECF No. 51 at 9.)

Cincinnati Insurance filed a motion to dismiss on July 24, 2024, arguing principally that the UIM provision of the Policy covers only drivers occupying "covered autos" that are specifically named and identified in the Policy, thereby excluding Mr. Garner, who was driving in his personal vehicle at the time of the accident.  (Def.'s Mot. Dismiss, ECF No. 20.)  The court denied the motion, finding that the Policy provided underinsured motorist coverage "to AHCC's employees driving any car so long as they were injured while driving in the course of employment."  (Order & Mem. Decision, Feb. 11, 2025, ECF No. 32 at 11.)  The court also determined that the Plaintiffs had adequately stated a claim for breach of the duty of good faith and fair dealing.  (Id. at 28.)

On May 23, 2025, while discovery was ongoing, Cincinnati Insurance filed the Motion for Summary Judgment at issue here.  (ECF No. 45.)

## LEGAL STANDARD

A court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those that might affect the outcome of the case.  Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) (citation omitted).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Roberts v. Associated Wholesale Grocers, Inc., No. 93-3327, 1994 WL 556887, at *1 (10th Cir., Oct. 12, 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In applying this standard, the court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." Ellis v. Salt Lake City Corp., 147 F.4th 1206, 1219 (10th Cir. 2025) (quoting Sawyers v. Norton, 962 F.3d 1270, 1282 (10th Cir. 2020)).

Once the movant shows there is an "absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)) (citation modified).

## ANALYSIS

### I.    Breach of Contract

#### A.  Course and Scope of Employment

Under the "coming and going" rule, "injuries suffered while going to or from work are not within the course of employment and thus not compensable under workers' compensation laws." Drake v. Indus. Comm'n of Utah, 939 P.2d 177, 182 (Utah 1997) (citation omitted). "[W]hether an injury arises out of and in the course of employment depends on the facts and

circumstances of each case." VanLeeuwen v. Indus. Comm'n of Utah, 901 P.2d 281, 284 (Utah Ct. App. 1995). And the "major focus" in deciding whether the coming and going rule applies "is on the benefit the employer receives and his control over the conduct." Whitehead v. Variable Annuity Life Ins. Co., 801 P.2d 934, 937 (Utah 1989).

The purpose of the coming and going rule is to consider whether an accident was the "consequence of risks and hazards to which all members of the traveling public are subject rather than risks and hazards having to do with and originating in the work or business of the employer." Drake, 939 P.2d at 182. Accordingly, Utah courts have held that employees are not always outside of the course and scope of their employment simply because they are traveling. For instance, the coming and going rule "does not apply when the employee is already at work, and the travel which gives rise to the accident is an integral part of the work itself." Aqua Massage, LLC v. Lab. Comm'n, No. 20030965-CA, 2005 WL 675008, at *1 (Utah Ct. App. Mar. 24, 2005) (citation modified). And when an employee "performs a regular part of work at home," it "transform[s] the home into a sort of island identified as part of the employment premises, so that the trip between the home and the main [workplace] may be analogized to a trip between two portions of the employer's premises." Id. at *2 (citation modified); see also State Ins. Fund v. Indus. Comm'n, 393 P.2d 397, 398–99 (Utah 1964) (affirming that the accident occurred within the course of employment when the employee traveled from an office in his apartment building to another office despite first returning to his apartment to have breakfast).

Cincinnati Insurance argues that Mr. Garner's injuries fall under the coming and going rule and therefore did not occur within the course and scope of his employment. (ECF No. 45 at 7–8.) In particular, Cincinnati Insurance contends that "Mr. Garner was at most driving from his home to work" when the accident occurred. (ECF No. 45 at 7.) There is some evidentiary

support for this position.  For example, Mr. Garner stated that he was on call from 5:00 p.m. the night before the accident until 9:00 a.m. the morning of the accident, thereby suggesting that the accident occurred after he had finished his on-call shift but before he saw any patients. (1st Garner Dep. 9:12–15.)  He was driving his own vehicle, he was not reimbursed for services or auto insurance, and he was not given instructions on his driving routes.  (2nd Garner Dep. 23:15–24:1, 24:6–8, 28:9–25, 32:2–25; Am. Compl. ¶ 6.)  Moreover, Mr. Garner was not reimbursed for mileage traveling from his home to his first patient visit of the day.  (2nd Garner Dep. 24:13–25:7.)  And Mr. Garner does not recall exactly where he was headed when the accident occurred.  (1st Garner Dep. 12:6–13:1.)

But the Plaintiffs contest several of these facts and have presented other evidence from which a reasonable jury could find that Mr. Garner's injuries did occur within the course and scope of his employment.  For instance, while Mr. Garner's injury prevents him from recalling most of the details surrounding his accident, he testified that he knows he was visiting a patient because he was wearing scrubs and was transporting his medical equipment.  (Id. at 12:6–17.) Mr. Garner stated that he often worked from his home before or after a shift to complete charting for his patients.  (Id. at 19:1–14.)  He also testified that he made an entry using company software the morning of the accident.  (ECF No. 51-13 at 5.)  And Mr. Garner's son recalls seeing his father in his scrubs typing on a work device before leaving home on the morning of the accident.  (Decl. Grantley Garner ¶¶ 4–6.)  A reasonable jury could therefore find that Mr. Garner's home became "a sort of island identified as part of the employment premises." Aqua Massage, LLC, 2005 WL 675008, at *2.  Indeed, because Mr. Garner was a traveling nurse, he had no fixed office.  (1st Garner Dep. 38:10–21.)  And other than while driving to see his first patient on a shift, AHCC paid Mr. Garner for his mileage.  (Id. at 24:6–8.)  Accordingly, the

Plaintiffs produced ample evidence that the "travel which [gave] rise to the accident [was] an integral part of the work itself." Aqua Massage, LLC, 2025 WL 675008, at *1.

In addition, the Plaintiffs produced evidence that AHCC exercised substantial control over Mr. Garner's conduct, even during his first drive of the day. For instance, AHCC required its traveling nurses to travel by car. (Huff Dep. 29:23–30:2.) An AHCC employee could not take a bus or otherwise lessen the "risks and hazards to which all members of the traveling public are subject" by moving closer to work. Drake, 939 P.2d at 182 (citation omitted). AHCC also required its traveling nurses to answer calls while traveling to visit patients, including on the way to the first visit of the day. (C. Garner Dep. 27:22–28:10; G. Garner Dep. 21:7–24; Brooks Dep. 30:2–7.) A reasonable jury could determine that AHCC exercised sufficient control over Mr. Garner's first drive of the day to find that his accident occurred during the course of his employment.

Given this evidence, the Plaintiffs have raised a genuine issue of material fact that is sufficient to defeat Cincinnati Insurance's motion for summary judgment. The court's holding is further supported by the number of exceptions that Utah courts have recognized to the coming and going rule, including

> where transportation was furnished by the employer to the benefit of the employer; where the employer requires the employee to use a vehicle as an instrumentality of the business; where the employee is injured while upon a special errand or special mission for the employer; where ingress and egress at the place of employment are inherently dangerous; and where the employee combined pleasure and business on a trip, and the business part predominated.

State (Tax Comm'n) v. Indus. Comm'n of Utah, 685 P.2d 1051, 1053 (Utah 1984) (citation modified). The Garners point to three exceptions that they argue apply to Mr. Garner's injuries: the traveling employee exception, the dual purpose exception, and the instrumentality exception. (See ECF No. 51 at 22–28.)

Under the traveling employee or "continuous coverage" exception, an employee whose work "entail[s] travel away from their employer's premises" is "within the scope of their employment continuously during the trip." Colvin v. Giguere, 330 P.3d 83, 87 (Utah 2014) (citation omitted). This rationale for this exception is that "[w]hen the travel is essentially part of the employment, the risk of injury during activities necessitated by travel remains an incident to the employment even though the employee may not actually be working at the time of the injury." Buczynski v. Indus. Comm'n of Utah, 934 P.2d 1169, 1174 (Utah Ct. App. Mar. 13, 1997) (citation modified). Under this exception, a reasonable jury could find that, even if Mr. Garner was not working at the time of the accident, his injuries are compensable because traveling to see a patient was an essential component of Mr. Garner's work as a traveling nurse.

Cincinnati Insurance disagrees, asserting that the facts here are analogous to the facts in a case from Louisiana, in which the court found that a home health nurse was not within the course and scope of her employment while driving to a patient's home. See Rattliff v. Reg'l Extended Home Care Personnel Servs., L.L.C., 135 So.3d 129, 133 (La. Ct. App. 2014). Louisiana law is not binding on Utah courts, of course, but the court finds that there are also distinctions between Rattliff and the Plaintiffs' evidence here that undermine Cincinnati Insurance's position. Notably, the Louisiana court highlighted that the plaintiff in Ratliff "was only assigned to care for one patient[,]" "traveled the same route to the patient's home each day," was only paid when she was at the patient's home, and "rarely used her laptop for work at home." Id. at 132. The Louisiana court may well have reached a different outcome if, as is true here, the plaintiff saw multiple patients at different locations and often worked from home.

The dual purpose exception states that an employee can recover for injuries occurring through conduct for which the primary purpose was not personal. See Ahlstrom v. Salt Lake

City Corp., 73 P.3d 315, 319 (Utah 2003).  The test for determining whether an employee's travel falls under this exception to the coming and going rule is "whether the trip is one which would have required the employer to send another employee over the same route or to perform the same function if the trip had not been made."  Whitehead, 801 P.2d at 937 (citation omitted).  There is evidence suggesting that AHCC would send another employee to visit a patient if the assigned traveling nurse were unable to complete the visit.  (Davies Dep. 16:5–15.)  A reasonable jury could therefore decide that Mr. Garner's conduct falls under the dual purpose exception to the coming and going rule.

Finally, under the instrumentality exception, "when an employee is required by his employer to bring his own vehicle to the place of business for use there, the employee is covered while going to and from work in the vehicle."  Bailey v. Utah State Indus. Comm'n, 398 P.2d 545, 546 (Utah 1965).  Two factors are critical: 1) "the degree of control the employer exercises over the employee's use of the vehicle," and 2) "the benefit the employer derives from the employee's use of the vehicle."  Davis v. Lab. Comm'n, 424 P.3d 1105, 1109 (Utah 2018) (citation omitted).  "These two factors are evaluated 'on a sliding scale,' so that if one factor is only weakly present, a strong showing of the other factor will be necessary in order to establish that a vehicle is an instrumentality."  Id. (quoting Jex v. Utah Lab. Comm'n, 306 P.3d 799, 807 (Utah 2013)).

A reasonable jury could find that the instrumentality exception applies in Mr. Garner's case.  As discussed above, the Plaintiffs have presented evidence that AHCC exercised control over Mr. Garner's use of the vehicle, for instance by requiring traveling nurses to take calls while driving to visit patients.  (See Huff Dep. 32:5–20; C. Garner Dep. 28:6–29:1; G. Garner Dep. 21:7–22:12.)  There is also evidence that AHCC derived a benefit from Mr. Garner's use of

10

the vehicle. Mr. Garner's ability to drive to visit patients was a vital component of the benefit he provided AHCC as a traveling nurse. This benefit extended both to working hours and emergency visits when Mr. Garner was on call. See Bailey, 398 P.2d at 546 (finding that the plaintiff's car was an instrumentality of his employer in part because of the benefit of the plaintiff being able to make emergency calls).

Because there are genuine issues of material fact regarding whether Mr. Garner's injuries occurred within the course and scope of his employment, the court denies the Defendant's motion for summary judgment on the Plaintiff's breach of contract claim.

### B.  Condition Precedent

Cincinnati Insurance argues that the Policy's coverage provision, which states that Cincinnati Insurance "will pay under this endorsement only after all liability bonds or policies have been exhausted by judgements or payments" (ECF No. 45-4 at 20), constitutes a condition precedent requiring the Garners to obtain payment from Mr. Haws's policy before they can recover from Cincinnati Insurance. (ECF No. 45 at 10–11 (citing McArthur v. State Farm Mut. Auto. Ins. Co., 274 P.3d 981 (Utah 2012)).) But this dispute is no longer relevant as the Garners have filed a supplemental authority demonstrating that the Garners have obtained payment from Mr. Haws's policy. (See ECF No. 67.)

### II.      Breach of the Covenant of Good Faith and Fair Dealing

The "implied covenant of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." Prince v. Bear River Mut. Ins. Co., 56 P.3d 524, 533 (Utah 2002) (quoting Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co., 949 P.2d 337, 344 (Utah 1997)). Under Utah law,

11

"[i]f a claim brought by an insured against an insurer is fairly debatable, [then] failure to comply with the insured's demands cannot form the basis of bad faith." Lund v. Truck Ins. Exch., 494 P.3d 1045, 1052 (Utah 2021) (citation omitted).

"[T]he determination of whether a claim was fairly debatable is made at the time the claim was denied." Hoopes v. Owners Ins. Co., Case No. 2:15-cv-00734-PMW, 2018 WL 3320799, at *2 (D. Utah Jul. 5, 2018) (citation omitted). "An analysis of whether an insurance claim is fairly debatable is closely related to an analysis of whether an insurer fulfilled its duty … to evaluate the claim fairly." M.A. v. Regence BlueCross BlueShield of Utah, 479 P.3d 1152, 1158 (Utah Ct. App. 2020) (quoting Jones v. Farmers Ins. Exch., 286 P.3d 301, 305 (Utah 2012)). In examining whether an insurer's decision was fairly debatable, Utah courts consider the circumstances surrounding the insurer's determination, including the "(1) standards of the insurance industry, (2) [Defendant's] interpretation of its own policy language, (3) [Defendant's] practices and procedures, and (4) other evidence of [Defendant's] internal policies and programs." Saleh v. Farmers Ins. Exch., 133 P.3d 428, 435 (Utah 2006). Generally, "an insurance company may reasonably and fairly rely, at least initially, upon a coverage opinion from qualified outside counsel, received in the course of careful investigation and evaluation of a claim." Fire Ins. Exch. v. Oltmanns, 370 P.3d 566, 569 (Utah Ct. App. 2016), aff'd, 2017 WL 5623415 (Utah Nov. 21, 2017).

Cincinnati Insurance argues that because it relied on outside counsel, its decision to deny coverage was fairly debatable. (See ECF No. 45 at 8–10.) Indeed, Cincinnati Insurance claims that "its reasoning and analysis was in fact that of expert, outside coverage counsel." (Id. at 9.) Litchfield Cavo provided an opinion stating that "[a]fter review of the claim file, policy, applicable statutes and case law," there was "no coverage for the potential claim of Mr. Garner

12

under the Cincinnati policy." (ECF No. 45-8 at 2.) As Cincinnati Insurance notes, Utah courts have found that "an expert's report generally provides a good faith basis for an insurer's defense of a bad faith claim." (ECF No. 45 at 9 (quoting Eldredge v. State Farm Mut. Auto Ins. Co., No. 2:12-cv-900-DAK, 2014 WL 1875663, at *6 (D. Utah May 9, 2014)).) But just because an expert's report generally provides a good faith basis does not mean it is guaranteed to do so.

The Plaintiffs have presented evidence that casts doubt on the opinion Litchfield Cavo provided Cincinnati Insurance. The Garners contend that Cincinnati Insurance did not forward the email from the Garners' pre-suit counsel regarding the relevant UIM endorsement provision to Litchfield Cavo. (ECF No. 51 at 30; Hill Dep. 80:9–81:1.) Ultimately, the opinion from Litchfield Cavo did not address that provision of the UIM endorsement. (Hill Dep. 91:10–22; ECF No. 45-8.) A reasonable jury could accordingly decide that Cincinnati Insurance failed to provide Litchfield Cavo with all information and that, therefore, Litchfield Cavo's opinion did not provide a good faith basis. See Selective Ins. Co. of S.C. v. Sela, 455 F. Supp. 3d 841, 860 (D. Minn. 2020), aff'd, 11 F.4th 844 (8th Cir. 2021) (quoting New Appleman on Insurance Law Library Edition § 55.04[2][b][ii] (2018) ("An insurer cannot rely on an expert opinion where the insurer has failed to provide the expert with important information in its possession.")).

A reasonable jury could also decide that Cincinnati Insurance's claim denial did not meet industry standards. For instance, the jury could decide that Cincinnati Insurance's actions failed to comply with the Egan Rule, which requires insurers to "look just as hard for reasons to pay claims as they look for reasons to deny claims." (ECF No. 51-7 at 41.)

Cincinnati Insurance further contends that because the Utah Supreme Court has not yet considered the specific issue, its coverage denial was fairly debatable. (ECF No. 45 at 10.) But the fact that the Utah Supreme Court has not weighed in on the matter does not shield Cincinnati

13

Insurance from a potential bad faith claim.  Since genuine issues of material fact remain regarding whether Cincinnati Insurance's denial of coverage constitutes bad faith, the court denies summary judgment on this claim.

### III.   Declaratory Judgment

The court denies summary judgment on this claim for the same reasons stated above.

### ORDER

For the foregoing reasons, the court ORDERS as follows:

1.   The Defendant's Motion for Summary Judgment (ECF No. 45) is DENIED.

2.   The parties have represented that discovery in this matter is complete.  (Pls.' Request for Sched. Conference, ECF No. 74; Def.'s Resp., ECF No. 75 at 1.)  The matter is therefore ready for trial, and the parties must file a request for a scheduling conference for the purpose of setting a trial date within seven days from the date of this order.

DATED this 19th day of March, 2026.

BY THE COURT:

_____
Tena Campbell
United States District Judge